# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| REAGANA L. GAMBLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:14-cv-00239-SLC |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, *sued as Carolyn W. Colvin,* | ) | |
| *Acting Commissioner of Social Security,* | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Reagana L. Gamble appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI").[1]  (*See* DE 1).  For the following reasons, the Commissioner's decision will be

REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in

accordance with this Opinion and Order.

## I.  PROCEDURAL HISTORY

Gamble applied for DIB and SSI in September 2011, alleging disability as of February 22,

2011.  (DE 10 Administrative Record ("AR") 183, 190).  The Commissioner denied her

applications initially and upon reconsideration.  (AR 121, 125, 133, 137).  Gamble requested a

hearing before an Administrative Law Judge (AR 147), and Administrative Law Judge Patricia

Melvin ("the ALJ") held a hearing on February 4, 2013, at which Gamble was represented by

---

[1] All parties have consented to the Magistrate Judge.  (DE 14); *see* 28 U.S.C. § 636(c).

counsel (AR 21).  On April 22, 2013, the ALJ issued an unfavorable decision, finding that Gamble was not disabled because she was capable of making a successful adjustment to other work that existed in significant numbers in the regional, state, and national economy.  (AR 89). Gamble requested the Appeals Council review the ALJ's decision (AR 15-17), and the Appeals Council denied Gamble's request, making the ALJ's decision the final decision of the Commissioner (AR 1-3).

Gamble filed a complaint with this Court on August 7, 2014, seeking relief from the Commissioner's final decision.  (DE 1).  In this appeal, Gamble alleges that the ALJ erred by: (1) failing to find Gamble's depression a severe impairment; (2) failing to find Gamble's blurred vision a severe impairment; (3) improperly discounting Gamble's credibility; and (4) failing to incorporate her finding of a moderate degree of limitation in concentration, persistence, or pace in the hypothetical posed to the vocational expert.  (DE 19 at 13-24).

## II.  FACTUAL BACKGROUND[2]

### A.  Background

On her alleged onset date, Gamble was 34 years old and had a high school education, with two years of college education.  (AR 26, 88, 190, 212).  Her employment history included briefly working for a newspaper, work as a material handler with temporary agencies for 15 years, work as an electronic board tester for five years, and part-time seasonal holiday work at a bookstore for six years.  (AR 29-31, 220).  Gamble last worked in February 2011 at a call center for the welfare office through the temporary agency, where she answered phone calls and

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 556-page administrative record necessary to the decision.

performed data entry.  (AR 27-28).

*B. Gamble's Testimony at the Hearing*

At the hearing, Gamble, who was five feet, eight inches tall and weighed 248 pounds, testified that she lives with her 12-year-old son and five-year-old daughter.  (AR 26).  Gamble stated that her family's income consists of money from Temporary Assistance for Needy Families (TANF), her son's SSI benefits, food stamps, and some child support from her daughter's father when he "wants to" pay.  (DE 27).  Gamble explained that she left work at the welfare call center after having a stroke at work in February 2011.  (AR 27, 29).  She has not looked for work since then because her doctor has not released her to go back to work, due to issues she still has from the stroke.  (AR 29).

Gamble stated that the biggest reason that she is unable to work is because of her balance problems from the stroke.  (AR 32).  She falls over to her right side "a few times a day."  (AR 32).  Although she is supposed to use a cane to walk, Gamble is embarrassed by it, so she walks holding onto someone's arm instead.  (AR 32).  Her right leg causes her a lot of pain, which she describes as a shooting pain, and the pain requires her to wear tennis shoes.  (AR 32).  Additionally, she cannot feel temperature in her right leg either.  (AR 32).

Gamble explained that she also has vision problems in her left eye from the stroke.  (AR 33, 37).  Her vision in her eye gets blurry when she looks at a television or computer screen for a long period of time.  (AR 33).  Gamble stated that her vision is blurred all day long, and that when she watches television, her eyes hurt and feel swollen.  (AR 33-34).  She also experiences headache-type pain when she hears loud noises.  (AR 34).

Gamble testified that her doctors had prescribed her medications to help with her symptoms from the stroke, and she had also been undergoing physical therapy to help her walk again.  (AR 34-35).  She had to stop physical therapy because her insurance only covered it for so long.  (AR 35).  The therapy did help her start walking again, taught her how to sit again, improved her balance, and made it so that she could feel her legs again.  (AR 35-36).  Gamble feels pain in her whole right leg, but the tips of her toes stay numb.  (AR 36).  The pain is a burning sensation.  (AR 36).

Gamble stated that she takes Tylenol for her leg pain, but no prescription medications for her leg.  (AR 36-37).  One of her doctors had given her prescription medication for her leg, but she does not like taking it because it makes it hard for her to focus, makes her drowsy, and makes it so she does not feel like herself.  (AR 35, 38).  She does not take any medication for her eye problems, but she was prescribed eyeglasses to help, although she does not wear them because they give her headaches.  (AR 38).

Gamble also testified that her heart disease makes her unable to work.  (AR 38-39).  She had to have three stents put into her heart, but those stents had scar tissue grow over them, so the doctors put in medicated stents instead of doing open heart surgery.  (AR 39-41).  The medicated stents cause her chest pain, which her doctors said she would have for awhile.  (AR 41).  Gamble stated that if scar tissue grows around the medicated stents, she will need double bypass open heart surgery.  (AR 42).

Gamble takes Plavix to prevent heart attacks and Crestor to lower her cholesterol.  (AR 42).  These medications cause her side effects such as diarrhea, drowsiness, nightmares, and

ringing in the ears. (AR 42-43). Gamble's doctors have also told her that she has to change her lifestyle and diet to manage her cholesterol and heart health, but she has a hard time eating healthy. (AR 43-44).

Gamble also takes four shots a day as well as pills to treat her diabetes, and her doctors recommended a change in her diet. (AR 44-45). Gamble explained that she has a hard time managing her blood sugar because she has to take her shots at the same time each day and she needs to eat several small meals each day, but she does not have an appetite for that. (AR 45). Gamble says that her blood sugar drops and she starts shaking, sweating, getting confused, and experiencing hot flashes. (AR 45). Gamble states that her blood sugar drops like that irregularly, sometimes several times in one week, but other times she is okay for a week or so. (AR 45).

Gamble stated that her diabetes affects her ability to work because it makes her fingers and toes numb and tingly, affects her eyes, and makes her body feel tired in general. (AR 46). Gamble explained that her high blood pressure gives her migraines, which also keeps her from working. (AR 46). Gamble does not have the migraines often though, and she has not been prescribed any medication for her migraines. (AR 47). Gamble stated that she has crying spells when she worries about her kids and her future. (AR 47). Her doctor has prescribed her the generic version of Zoloft for her depression. (AR 48). Gamble stated that she sometimes is unable to sleep, but other times she sleeps all of the time. (AR 49). Gamble does not have a lot of energy, which she attributes to both her physical problems and her depression. (AR 49).

Gamble testified that she has memory loss, which may be from the stroke, and it embarrasses her because people tell her she has already had the same conversation before, but

she forgot about it.  (AR 49).  Gamble stated that when she forgets things, she cries.  (AR 49).

Gamble also has trouble focusing and stated that she will wander off during a conversation with

someone.  (AR 50).  Her doctor recommended counseling, but Gamble was embarrassed to

attend counseling, so she has not gone.  (AR 50).  She has also had a problem with stuttering

since her stroke.  (AR 50-51).

Gamble stated that she could walk a block, but it would feel like a mile; that she needed a

cane to walk, but she was embarrassed to use it; that she can stand for five or ten minutes; that

she can sit for 20 minutes; that she can reach overhead but not for a long period of time; that she

can reach forward, but her arms feel like they are falling asleep; that she can grasp things with

her hands, but sometimes she drops things because they fall out of her hands, particularly her

right hand; that she can push with her legs but not for a long period of time; that she can climb

stairs but then has to sit and rest; that she can bend over if she has something to hold onto; that

she socializes with her family and friends; that she used to go to church but has not gone back

since she fell while at church; that she gets nervous when she is around a lot of people; that she

can get in and out of the shower herself by holding onto a support; that she can get into the tub by

herself but needs help getting back up; and that she has a driver's license and drives sometimes,

but she has to have someone in the car to keep her from forgetting where she is going.  (AR 51-

56).  Gamble cannot use her hands all day; she would need to "rest them quite a bit of the day."

(AR 61).  Her fingers tingle, so she cannot fasten the buttons on her clothes; she forgets how to

do some simple tasks and then gets very upset about forgetting; she sleeps most of the day and

night because she feels tired all of the time; she gets out of breath a lot and has to rest.  (AR 62-

63).

Gamble stated that she used to enjoy singing at church, but she has not been able to since her stroke. (AR 56). She also used to take her kids to the park and bowling, but she cannot do those things anymore either. (AR 56). She does some cooking, although her son helps her when she is really tired. (AR 56-57). Gamble's father does the grocery shopping, and her son helps her clean up after meals. (AR 57). Gamble does laundry, but her mother helps her sometimes. (AR 57). Gamble's son makes and changes his bed and helps her with her bed. (AR 57). Gamble's son also does the mopping, sweeping, and vacuuming, because she will lose her balance if she does those things. (AR 57-58).

Gamble described her typical day as getting up at 6:30 a.m. with her son and daughter before school. (AR 58). Her son helps her daughter get dressed for school, and her parents or her sister come to take the kids to school. (AR 58). Then Gamble takes her medicine at 7:00, and by 7:30, she is exhausted so she goes back to sleep until the kids get home from school. (AR 58). Her mother will sometimes come over to help her cook for the kids, or her father will come and pick Gamble up after picking up the kids from school and take them all to Gamble's parents' house for dinner. (AR 58-59). When Gamble and her kids are home, they do homework together and then have family time by playing a board game or spending time together. (AR 59). Then the kids take baths and get settled in, watching some television or playing games. (AR 59). Then they go to bed by 9:00 p.m. (AR 59).

Gamble does not smoke and does not drink alcohol. (AR 59). She does not use any illegal drugs. (AR 60).

*C. Vocational Expert's Testimony at the Hearing*

A vocational expert, Marie Kieffer ("the VE"), also testified at the hearing. (AR 21). The VE, after reviewing the records in the file related to Gamble's work history, answered a hypothetical question posed by the ALJ. (AR 7-9; 68-72). The ALJ and VE had the following conversation during the hearing:

> ALJ: Okay. Assuming someone of the claimant's age, educational background, and vocational history, who can lift and carry 20 pounds occasionally, 10 pounds frequently, and can stand and walk 6 of 8 hours in an 8-hour workday, and sit for approximately 6 of 8 hours with normal breaks. Can such a person do claimant's past relevant work?
>
> VE: With those limitations, yes.
>
> ALJ: Okay. If to that we add that handling objects, and by that I mean gross manipulation is limited to occasional fingering which is fine manipulation is limited to occasional, and the work must be limited to simple routine and repetitive tasks consistent with unskilled work, can such a person do claimant's past relevant work?
>
> VE: With those limitations, no; the past work would be eliminated.
>
> ALJ: Is there other work in the economy such a person can perform?
>
> VE: Yes. With those limitations, a job that would apply would be a bakery worker; it's a light job with an SVP of 2; DOT #524.687-022. I would estimate 740 in the region; 5,000 in the state; and 230,000 nationally. Also the job of a rental clerk could accommodate the limitations. It's also a light job with an SVP of 2; DOT #295.357-018. That's listed as a furniture rental consultant in the DOT, but is representative of other rental consultants. And I would estimate 900 in the region; 13,000 in the state; and 400,000 nationally. Also the job of an usher would accommodate

those limitations. It's also a light job with an SVP of 2; DOT #344.677-014. I would estimate 100 in the region; 1,000 in the state; and 100,000 nationally.

ALJ: Okay. Let's assume of the claimant's age, educational background, and vocational history who can lift and carry 10 pounds occasionally; less than 10 pounds frequently; can stand or walk for approximately 2 hours out of an 8-hour day; can sit approximately 6 hours out of an 8-hour day with normal breaks; who can never climb ladders, ropes, or scaffolds; never climb ramps or stairs; never balance; never stoop, crouch, kneel, and crawl; and the work must be limited to jobs that can be performed while using a hand-held assistive device on uneven terrain and for prolonged ambulation; and a job in which the employee can avoid concentrated exposure to extreme cold, extreme heat, use of hazardous machinery, and to unprotected heights; and work limited to simple routine and repetitive tasks consistent with unskilled work. Can such a person do claimant's past relevant work?

VE: No. The past work would be eliminated with those limitations.

ALJ: Okay. Is there work in the economy such a person can perform?

VE: Yes. Considering those limitations, a job that would be applicable would be a surveillance system monitor; DOT #379.367-010. That's listed as a government service in the DOT but is representative of monitors elsewhere. I'd estimate 150 in the region; 600 in the state; and 40,000 nationally. Also, the job of call-out operator could accommodate the limitations; it's also an SVP of 2 and a sedentary job; DOT #237.367-014. I'd estimate 100 in the region, 600 in the state; and 60,000 nationally. And also the job of an addresser could accommodate the limitations; also sedentary with an SVP of 2; DOT #209.587-010. I would estimate 100 in the region; 700 in the state; and 96,000 nationally.

ALJ: Okay. Other than what you've already mentioned to do

9

with the furniture rental clerk and the surveillance system
monitor, has your testimony today been consistent with the
DOT?

VE:    Yes.

(AR 7-9).

### D. Summary of the Relevant Medical Evidence

Gamble suffered a stroke on February 21, 2011, and she was admitted to the hospital with

significant right-side weakness. (AR 290). While she was in the hospital, Dr. Ajay Gupta

performed a neurological consultation, diagnosing Gamble with an acute left temporal infarct

with mild right hemiparesis and sensory loss of the right leg. (AR 295). Dr. Gupta noted that

Gamble had risk factors including diabetes, hypertension, her ethnicity, and noncompliance with

treatment. (AR 295). Dr. Gupta recommended that Gamble's risk factors be managed, and he

further recommended physical therapy and occupational therapy evaluation and treatment. (AR

295). Gamble was discharged when her condition had stabilized on February 28, 2011, with a

list of medications she was directed to take, a restricted diet, and instructions to monitor her

blood sugar. (AR 295). Gamble continued to receive treatment from various doctors and

therapists after her stroke. (AR 339-59, 410-43).

Gamble saw Dr. Gupta for a follow up in May of 2011. (AR 361). Dr. Gupta noted that

Gamble had significant depression, with episodes of spontaneous crying. (AR 361). He further

wrote that Gamble had difficulty maintaining attention and concentration, and that she had

hypersomnia and took naps frequently throughout the day. (AR 361). Dr. Gupta noted that he

believed "[i]t would be safer for [Gamble] to remain at home with [her] mother until there is

improvement in cognition and mood, and [until Gamble] is able to take care of herself and her children." (AR 362).

Gamble saw Dr. Gupta again in August 2011. (AR 373). Dr. Gupta documented that Gamble had difficulty with speech fluency, memory problems, and word finding difficulty. (AR 373). He further noted that Gamble was still exhibiting symptoms of depression. (AR 373).

Gamble saw Dr. Henry Martin, a consultative psychologist, for a psychological examination in October 2011. (AR 377). Dr. Martin noted that Gamble reported not feeling like herself, having difficulty focusing, problems with forgetfulness, and crying all the time. (AR 378). Dr. Martin administered the Wechsler Memory Scale - Fourth Edition test, and found that Gamble was in the "Low/Average Range of Memory Functioning," with better results on *"Immediate Memory* across all subtests," but "more difficulty recalling information on delayed presentation," with "particular deficits particularly in those verbal areas of *Logical Memory* and *Verbal Paired Associates*," and "does better on the *Delayed Memory* task of both the *Design* and *Visual* subtest." (AR 381). Dr. Martin diagnosed Gamble with depression, secondary to her medical condition, severe psychosocial stressors as the result of her stroke, and assigned Gamble a Global Assessment of Functioning ("GAF") score of 45.[3] (AR 381). Dr. Martin noted that

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (Text Revision, 4th ed. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id*. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). *Id*. A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-

Gamble was "dependent upon her family, sister, and friends, for many of her daily needs and has difficulty walking, focusing, etc." (AR 381).

In January 2013, Gamble saw Dr. Martin again at the request of her attorney. (AR 514). Dr. Martin noted that Gamble's responses during the interview "were sluggish and she had difficulty retrieving information." (AR 515). Dr. Martin found that Gamble's mood and affect were depressed, that she was "teary" during the interview, and she "communicate[d] many hopeless thoughts." (AR 515). Gamble reported feeling stressed all the time, crying a lot, and being unable to do things with her children; she reported that her children had to help her. (AR 515). Gamble stated that she did not understand why she was living, and she did not believe that she had much longer to live. (AR 515). She also explained that she stayed home all the time because she is afraid of falling in public, and reported that she no longer goes to church because she fell at church once. (AR 515). Gamble informed Dr. Martin that she sleeps from 8:30 p.m. until 7:00 a.m., when she wakes up to get the children ready for school, but then she goes back to bed. (AR 516). Gamble reported that "many of her friends avoid her because she has difficulty maintaining a conversation and forgets things they tell her." (AR 516). Dr. Martin diagnosed Gamble with major depression, secondary to her medical condition; dependent personality disorder; severe psychosocial stressors, and assigned Gamble a GAF score of 40. (AR 516).

workers). *Id.*

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in assessing Gamble, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Id.*

### IV.  ANALYSIS

#### A.  The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D) .

In determining whether Gamble is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required her to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

## B. The ALJ's Decision

On April 22, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 79-89). At step one, the ALJ found that Gamble had not engaged in any substantial activity since February 22, 2011, the alleged onset date. (AR 81). At

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 404.945(a)(5), 416.920(e), 416.945(a)(5).

step two, the ALJ found that Gamble had the following severe impairments: status/post

cerebrovascular accident (CVA), type II diabetes, coronary artery disease, and obesity. (AR 81).

At step three, the ALJ found that Gamble did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (AR 83).

> Before proceeding to step four, the ALJ determined that Gamble had the following RFC:
>
> [T]he claimant has the residual functional capacity to perform sedentary work as
> defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant is able to
> lift and carry ten pounds occasionally and less than ten pounds frequently;
> stand/walk two hours and sit six hours out of an eight-hour work day with normal
> breaks. However, the claimant should never climb ladders/ropes/scaffolds; never
> climb ramps & stairs; never balance, stoop, crouch, kneel and crawl. The
> claimant is limited to jobs that can be performed while using a hand held assistive
> device on uneven terrain and for prolonged ambulation and must avoid
> concentrated exposure to extreme cold, extreme heat, use of hazardous machinery
> and to unprotected heights. The claimant is also limited to simple, routine and
> repetitive tasks consistent with unskilled work.

(AR 83).

At step four, the ALJ found that Gamble had no past relevant work. (AR 88). The ALJ

then concluded at step five that Gamble could perform a significant number of unskilled,

sedentary jobs in the economy, including surveillance system monitor, call out operator, and

addresser. (AR 88-89). Accordingly, the ALJ determined that Gamble was not disabled from

February 22, 2011, the alleged onset date, through April 22, 2013, the date of the ALJ's decision,

and Gamble's claim for DIB and SSI was denied. (AR 89).

### C. *The ALJ's Failure to Include Limitations on Concentration, Persistence, or Pace*
*in the RFC and the Hypothetical Posed to the VE Requires Remand*

Gamble argues that the ALJ did not properly incorporate Gamble's limitations in

sustaining work into the RFC or the hypothetical posed to the VE, even though the ALJ found that Gamble had moderate difficulties in concentration, persistence, or pace, and even though evidence in the record, including the opinions of Dr. Gupta and Dr. Martin, support Gamble having limitations in sustaining work.

As explained earlier, "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). "The RFC assessment must be based on *all* of the relevant evidence in the case record . . . ." SSR 96-8p, 1996 WL 374184, at *5 (Jan. 1, 1985); *see* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Cases from the Seventh Circuit Court of Appeals "generally have required the ALJ to orient the VE to the totality of a claimant's limitations." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (citations omitted). "[The] cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." *Id.*

More specifically, in *O'Connor-Spinner*, the Seventh Circuit concluded that the ALJ erred where he found that the claimant had moderate difficulties in concentration, persistence, or pace, but failed to specifically observe this limitation when posing hypotheticals to the VE at step five. *Id.* at 620-21. In doing so, the court acknowledged that it has not insisted "on a per se requirement that this specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases." *Id.* at 619. The court explained:

> We also have let stand an ALJ's hypothetical omitting the terms
> 'concentration, persistence and pace' when it was manifest that the
> ALJ's alternative phrasing specifically excluded those tasks that
> someone with the claimant's limitations would be unable to
> perform. We most often have done so when a claimant's

16

> limitations were stress- or panic-related and the hypothetical
> restricted the claimant to low-stress work.

*Id.* at 619 (citing *Arnold v. Barnhart*, 473 F.3d 816, 820 (7th Cir. 2007) (upholding a

hypothetical restricting the claimant to work involving low production standards and a low-stress

environment, where the claimant's difficulties with concentration, persistence, or pace arose

from stress-induced headaches, frustration, and anger); *Johansen v. Barnhart*, 314 F.3d 283, 288-

89 (7th Cir. 2002) (allowing a hypothetical formulated in terms of "repetitive, low-stress" work

to stand, where the claimant's deficits in concentration, persistence, or pace stemmed from a

panic disorder); *Sims v. Barnhart*, 309 F.3d 424, 427, 431-32 (7th Cir. 2002) (finding that the

ALJ's restricting the claimant from jobs "involving complex work processes or unusual levels of

stress" adequately accommodated the claimant's concentration problems arising, in part, from a

panic disorder)).

    "In most cases, however, employing terms like 'simple, repetitive tasks' on their own will

not necessarily exclude from the VE's consideration those positions that present significant

problems of concentration, persistence and pace." *Id.* at 620 (finding that a restriction to

repetitive tasks with simple instructions did not necessarily account for the claimant's

depression-related problems in concentration, persistence, and pace) (collecting cases); *see also*

*Warren v. Colvin*, 565 F. App'x 540, 544 (7th Cir. 2014) (finding that a limitation to "simple,

repetitive tasks" did not adequately account for the claimant's concentration problems arising

from depression and borderline intellectual functioning); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th

Cir. 2014) (concluding that a limitation to unskilled work did not sufficiently account for the

claimant's concentration problems stemming from depression and a psychotic disorder). "The

ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner*, 627 F.3d at 620 (citing *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); SSR 85-15, 1985 WL 56857, at *6 (1985)).

"Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85-15, 1985 WL 56857, at *6 ("The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. . . . Thus, the mentally impaired may have difficulty meeting the requirements of even so-called 'low-stress' jobs."). Accordingly, the RFC and hypotheticals "must account for *both* the complexity of the tasks and the claimant's ability to stick with a task over a sustained period." *Warren*, 565 F. App'x at 544 (emphasis added) (citations omitted); *see Yurt*, 758 F.3d at 858 (articulating that an RFC for unskilled work "by itself does not provide any information about [the claimant's] mental condition or abilities").

Here, the ALJ concluded that Gamble had moderate limitations in concentration, persistence, or pace when considering the paragraph B criteria (AR 82), but the ALJ did not include this limitation in the RFC and the hypothetical to the VE (AR 7-8, 83). Instead, the ALJ posed a hypothetical to the VE limiting Gamble, in relevant part, to "work limited to simple

routine and repetitive tasks consistent with unskilled work." (AR 7-8). When considering the

paragraph B criteria, the ALJ stated:

> The third functional area is concentration, persistence, or pace. In
> this area, the claimant has moderate limitation. The undersigned
> notes that the psychological consultative examination performed by
> Dr. Martin indicates moderate impairment regarding the ability to
> understand, remember and carry out detailed instructions. The
> evaluation is unclear whether this is the result of the CVA
> [(residual effects from her stroke)] or depression. However, given
> the claimant's treatment history for depression, which suggests
> only mild limitations with regard to this area, the undersigned finds
> that the moderate limitation in this area is more appropriately
> attributed to the claimant's st[r]oke (Ex. 7F and 20F).

(AR 82). In the RFC the ALJ assigned to Gamble, the ALJ included that she was "limited to

simple, routine and repetitive tasks consistent with unskilled work." (AR 83). During the

hearing, the ALJ asked the VE a hypothetical which included a limitation "to simple routine and

repetitive tasks consistent with unskilled work." (AR 7-8).

Gamble's problems with concentration, persistence, or pace are related to both her

depression and the residual damage from her stroke. The ALJ found that Gamble's moderate

limitation in concentration, persistence, or pace was "more appropriately attributed to the

claimant's st[r]oke" than to her depression; the ALJ did not find that Gamble's impairments in

these areas were caused by panic attacks or anxiety. (AR 82). Thus, this case is more analogous

to *O'Connor-Spinner*, where the claimant's concentration problems were depression-related and

a hypothetical for "repetitive tasks with simple instructions" was found inadequate, 627 F.3d at

620, than it is to *Johansen*, where the claimant's concentration problems stemmed from a panic

disorder and a hypothetical for "low-stress, repetitive" work was found adequate, 314 F.3d at

289.  Because the ALJ found that Gamble's problems in concentration, persistence, or pace were

caused by her stroke and depression, not anxiety or panic attacks, the ALJ's hypothetical limiting

Gamble to simple, repetitive tasks consistent with unskilled work was insufficient to account for

her problems in concentration, persistence, or pace.  "[T]he ALJ committed error by not

explaining what evidence supported her belief that [Gamble] was able to complete tasks, even if

repetitive and simple, over a *sustained* period of time at a *competitive pace*."  *Stanifer v. Colvin*,

No. 4:13-CV-053-JD, 2015 WL 437773, at *11 (N.D. Ind. Feb. 3, 2015) (reversing and

remanding the case, in which the claimant suffered residuals from a stroke, because "the ALJ did

not adequately explain what evidence supported her conclusion that merely limiting [the

claimant] to simple, unskilled work actually accounted for [the claimant's] problems with

sustaining attention, concentration, and pace").

The Commissioner acknowledges that the ALJ did not include Gamble's concentration,

persistence, or pace difficulties in the RFC or the hypotheticals posed to the VE, but contends

that the ALJ did not need to include these limitations in the RFC because an ALJ's finding of

limitations when considering the paragraph B criteria is not an RFC assessment, as an RFC

assessment requires "a more detailed assessment."  (DE 25 at 5).  While the Court agrees that the

ALJ's findings at step two and three when considering the paragraph B criteria are not,

themselves, an RFC assessment, the ALJ's opinion must nevertheless be consistent within itself

and build a logical bridge for the ALJ's reasoning.  *See Clifford*, 227 F.3d at 872 (The ALJ "must

build an accurate and logical bridge from the evidence to his conclusions." (citations omitted));

*Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (stating that the ALJ's decision must

demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion).

Here, as in *Stanifer*, the ALJ has failed to explain how limiting Gamble to simple, repetitive tasks consistent with unskilled work sufficiently accounts for Gamble's limitations in concentration, persistence, or pace caused by the residual effects from her stroke. This is error and requires remand.

The Commissioner also argues that the ALJ never found that Gamble had moderate difficulties with concentration, persistence, *and* pace, but rather found that Gamble had moderate difficulties with concentration, persistence, *or* pace. (DE 25 at 5). As noted by Gamble, the Seventh Circuit has squarely rejected this argument, finding that "[t]he word 'or' has an inclusive sense . . . as well as an exclusive one," and "that 'or' is generally used in the inclusive sense"; the Seventh Circuit explained that "the agency forms from which these terms emanate often lump concentration, persistence, and pace together as an umbrella category" for "one broad category of functioning." *Varga v. Colvin*, 794 F.3d 809, 815-16 (7th Cir. 2015).

Next, the Commissioner argues that the "ratings of these broad functional areas" at steps two and three do not translate into specific work-related limitations in all three areas, and cites to case law for the contention that an ALJ is not required to include these preliminary ratings in the RFC finding. (DE 25 at 6 (citing *Wilson v. Colvin*, No. 1:14-cv-01240-WTL-MJD, 2015 WL 2260530, at *8 (S.D. Ind. May 13, 2015); *Klahn v. Colvin*, No. 13-C-165, 2014 WL 841523, at *15 (E.D. Wis. Mar. 4, 2014)). While the ALJ may not be required to include these preliminary ratings in the RFC finding, the ALJ's decision must still be internally consistent, and it must provide a logical bridge for the reasoning in the decision. *See Clifford*, 227 F.3d at 872; *Rohan*,

98 F.3d at 971. Here, the ALJ's decision is not consistent, as the Seventh Circuit has "repeatedly rejected the notion that a hypothetical . . . 'confining the claimant to simple, routine tasks . . . adequately captures . . . limitations in concentration, persistence, and pace.'" *Varga*, 794 F.3d at 814. Without the necessary explanation and logical bridge, these portions of the ALJ's decision are inconsistent and constitute error.

Additionally, the Commissioner contends that the ALJ's stated reason for assigning Gamble a rating of moderate difficulties in the broad area of concentration, persistence, or pace was because Dr. Martin's psychological examination indicated "moderate impairment regarding the ability to understand, remember and carry out detailed instructions" (AR 82), and therefore the ALJ's inclusion of the limitation that Gamble was "limited to simple, routine and repetitive tasks consistent with unskilled work" in the RFC finding and the hypothetical posed to the VE sufficiently addressed the specified reason for the ALJ's finding of moderate difficulties in concentration, persistence, or pace. (DE 25 at 7). Again, the Court will emphasize that limitations on the *difficulty* of tasks are completely different from and do not address an individual's limitations on the ability to *sustain* work. *See Varga*, 794 F.3d at 814-15.

Additionally, the Court notes that neither of Dr. Martin's reports state that Gamble had difficulty in understanding, remembering, and carrying out detailed instructions. This appears to be the ALJ's summary of Dr. Martin's reports from his examinations of Gamble. In fact, Dr. Martin noted in his reports that Gamble reported "difficulty focusing" and forgetfulness (AR 378), and that she "feels depressed and cries on a daily basis" (AR 380). Dr. Martin found that Gamble was "dependent upon her family, sister, and friends, for many of her daily needs and has

difficulty walking, focusing, etc." (AR 381). Dr. Martin also conducted the Weschler Memory Scale - Fourth Edition test on Gamble and found that she was in the "Low/Average Range of Memory Functioning," and she had "more difficulty recalling information on delayed presentation," as well as particular deficits particularly in those verbal areas of *Logical Memory* and *Verbal Paired Associates* . . . ." (AR 380). After examining Gamble in October 2011, Dr. Martin diagnosed her with depression and noted that she had "severe" psychosocial stressors resulting from her stroke, and he assigned her a GAF score of 45. After examining Gamble again in January 2013, Dr. Martin noted that Gamble had "sluggish" responses, "difficulty retrieving information," a depressed mood and affect, as well as "many hopeless thoughts." (AR 515). Dr. Martin also noted that Gamble goes to bed at 8:30 p.m., wakes up at 7:00 a.m. to get her children ready for school, but then returns to bed during the day. (AR 516). Dr. Martin diagnosed her with major depression, dependent personality disorder, severe psychosocial stressors, and assigned her an even lower GAF score of 40. Dr. Martin's notes are consistent with Gamble's testimony that she has problems with focusing and forgetfulness (AR 49-50) as well as with Dr. Gupta's notes that Gamble had problems "maintaining attention and concentration" and problems with her memory (AR 361-62).

The ALJ did not adequately explain how limiting Gamble to simple, repetitive tasks consistent with unskilled work accounts for her difficulties in maintaining concentration, persistence, and pace. The ALJ did not address Dr. Gupta's notes that Gamble had problems with attention and concentration. And while the ALJ noted that Dr. Gupta described Gamble having difficulties with speech fluency, memory difficulties, and word finding difficulty, the ALJ

discounted this on the basis that she had not observed Gamble exhibit any difficulties with speech fluency or word finding at the hearing. (AR 85). While the ALJ "accorded controlling weight to Dr. Gupta's observations" (AR 87), the ALJ's only explanation for not crediting Dr. Gupta's notes regarding Gamble's memory, attention, and concentration problems, was the ALJ's finding "that the limitations due to the residuals related to the CVA [(stroke)] . . . are adequately addressed by the sedentary [RFC] and related environmental limitations described above." A sedentary RFC and environmental limitations do not adequately account for Gamble's problems with concentration, persistence, and pace, which are supported by the notes of Dr. Gupta and Dr. Martin, as well as Gamble's own testimony. This was error. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (stating that an ALJ must "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability" (citation omitted)).

Therefore, on this record, the Court concludes that the RFC assigned by the ALJ does not adequately account for Gamble's moderate difficulties in maintaining concentration, persistence, or pace. In the portion of the decision devoted to the RFC finding, the ALJ appears to have glossed over the evidence in the record supporting limitations in concentration, persistence, and pace, despite finding Gamble to have moderate difficulties in these areas at step two when considering the paragraph B criteria.[5] Accordingly, the Commissioner's final decision will be remanded for the purpose of reassessing Gamble's mental RFC on these points.[6]

_____

[5] In addition, the ALJ failed to address the opinions of Dr. J. Gange and Dr. William A. Shipley, the state agency psychologists, who reviewed the record and assigned Gamble limitations. (AR 95-116, 402). Therefore, the ALJ should consider these opinions upon remand. *See Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (stating that the ALJ's failure to discuss a physician's report "in its entirety prevents [the] court from tracking the ALJ's reasons for discounting it").

[6] Because a remand is warranted on this basis, the Court need not reach Gamble's remaining arguments.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Gamble and against the Commissioner.

SO ORDERED.

Entered this 30th day of September 2015.

S/Susan Collins
Susan Collins
United States Magistrate Judge